COLLINS & CO. *v.* UNITED STATES (No 774).[1]

COLLINS'S OXIDE, A PIGMENT AND NOT IRON ORE.

The importation can not be profitably smelted; it has been made unfit for smelting by the pulverizing treatment to which it has been subjected. It can not properly be considered iron ore in the sense of the relevant clause, tariff act of 1897. The primary and chief use of it as it appears is to impart color to fiber boards, and it was dutiable as "colors or pigments" under paragraph 58 of that act. The cases relied on to the contrary dealt with iron in a crude state and not adapted as imported for use as a color.—Drakenfeld & Co. *v.* United States (2 Ct. Cust. Appls., 512; T. D. 32247).

United States Court of Customs Appeals, March 20, 1912.

TRANSFERRED from United States Circuit Court for District of Massachusetts, G. A. 6857 (T. D. 29947), Abstract 26646 (T. D. 31833).

[Affirmed.]

*Searle & Pillsbury (Wm. E. Waterhouse* of counsel) for appellants.

*William L. Wemple,* Assistant Attorney General (*Charles D. Lawrence* on the brief), for the United States.

Before MONTGOMERY, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise involved in this case was assessed for duty under paragraph 58 of the act of 1897, which reads as follows:

All paints, colors, pigments, lakes, crayons, smalts and frostings, whether crude or dry or mixed, or ground with water or oil or with solutions other than oil, not otherwise specially provided for in this act, thirty per centum ad valorem; all paints, colors, and pigments, commonly known as artists' paints or colors, whether in tubes, pans, cakes or other forms, thirty per centum ad valorem.

The sole claim presented by the importers in this court is that it should have been assessed as iron ore under paragraph 121 of the same act, which reads:

Iron ore, including manganiferous iron ore, and the dross or residuum from burnt pyrites, forty cents per ton. * * *

The first question presented is whether the product in question is an iron ore in the tariff sense. Under the heading of metals, and manufactures of, appears the provision for iron ore above quoted, and this is followed by various provisions for the products of smelted iron, indicating that the term iron ore was used in the sense of the commercial commodity adapted to smelting. The testimony offered in the present case indicates that the term iron ore is applied by scientific men to include all products or concentrates of native iron ore which are susceptible of being smelted, and this without regard to whether, as a commercial proposition, the product could be profitably smelted, in view of its value for other purposes. On the other hand, the testimony of practical iron men is to the effect that the

substance here in question could not profitably be smelted, and that it has been made unfit for smelting by the treatment to which it has been subjected.

The substance in question is mined at Chew Magna, near Bristol, in Wiltshire, England. Its use is admittedly that of loading and coloring fiber board or paper. So employed, it gives to the paper a color somewhat resembling leather. The evidence discloses that after the substance is mined from the earth it goes through a process which is described by one witness as follows:

Q. Then, going back to the levigating process, what does that consist of?—A. This levigating makes a separation, and part of it, part of this material, becomes dross, which is thrown out; and when I was there nine years ago they had a pile of dross of this material as large as the mill itself.

Q. What use did they make of the dross?—A. At that time they had no use for it, but when I was there last winter I learned that they were creating a use for it by grinding it up again and using it for oilcloth, for the backing and coloring of the back of oilcloth.

Q. Please describe the next process—or was that the process of levigation that you have described?—A. Yes.

By Judge WAITE:

Q. How is that done, by heat?—A. No; levigation is done by floating it. Just as the ore is ground under the chasers water is let into the chaser and everything that is reduced to fineness is floated off. First the impurities or coarser particles settle out of it, and then the fine runs off into vats, and there it is settled and the water drawn off. This precipitate or settling is then drawn off into kilns and there dried. That is formed into cakes, and from that it is pulverized into the condition of the material in Exhibit No. 2.

The undisputed testimony is that an ore as fine as this is in its natural state may be better smelted with the lumps retained in it, and furthermore, there is strong evidence occurring both in the testimony of the Government witnesses and one of the witnesses of the importer that where attempt is made to smelt as fine ores as this which may be found in nature, it is customary to mix coarser ores with it or to reduce some of the ore to nodules or briquets. It will be seen therefore that this native ore has been subjected to a process which is the reverse of what is required for fitting this material as a smelting ore. It has been first crushed, then levigated, put through a dry kiln, formed into cakes, in which state it would be in better condition for smelting than in its present state, but not left in that state, but pulverized into the condition which it now presents. In that condition it is imported under another name or brand of O. W. S. and is sold either by that name or as Collins's oxide. We think the weight of the testimony establishes that this product is not an iron ore in the sense used in the tariff act of 1897.

We think these conclusions are fully supported by the decisions of the Board of General Appraisers, and have not been overruled by the cases of Francklyn v. United States (119 Fed. Rep., 470) and Hill v. Francklyn (162 Fed. Rep., 880), relied upon by counsel for the im-

porter. In fact, we think the cases mark the line between iron ore and pigment very clearly.

The earliest board decision was G. A. 1312 (T. D. 12663), in which case the merchandise was described as crude hematite iron ore, and the opinion of the board states:

The ore is chiefly in lumps and generally of a reddish color, although in some of the lumps iron presents the same appearance that it does in fractured cast iron.

It was held that while the ore is fit to be manufactured into a color, it is not in its present condition a color, and is not so commercially known. For this reason it was held to be dutiable as iron ore.

The question next arose in G. A. 4665 (T. D. 22057). The merchandise was an impalpable powder of a dark-gray color and of a pronounced metallic luster. It was included in invoices with paints and varnishes, being described therein as "dry ferrodor." Its value was about $88 per ton. It was used in the manufacture of fine castings and for the filling in of blowholes in castings. The board said—

While this testimony indicates that the merchandise is not a paint or a color, it also indicates that it is not iron ore, which must be smelted and made into pig iron before it can be used for the purposes mentioned.

The board further said:

As appears from the special report of Dr. Moore, chemist, in charge of the laboratory, it is ferric oxide, and its composition the same as hematite iron ore, but is not iron ore in its present state, differing therefrom in appearance, condition, and the uses to which it may be applied.

In Vandegrift *v.* United States (107 Fed. Rep., 265) a pigment very much like that involved in this case was under consideration. The court, in deciding the case, said:

Upon conflicting testimony, the Board of General Appraisers has found that the merchandise in question is a red pigment, imported to be used as a color and filler, is a hematite ore, is not in fact an ochery earth, is not commercially known as an ocher, and is a color, and therefore was properly assessed for duty as a color at 25 per cent ad valorem, under the provisions of paragraph 48 of the act of August 27, 1894.

The importer claimed this importation to be exempt as ocher, under paragraph 566 of the same act. The court said:

While there is no satisfactory or sufficient evidence to the effect that this article is an ocher, there is much testimony that it is an oxide of iron, and not a red ocher and some testimony that it has been ground, and prepared so as to be used as a color. In these circumstances I feel bound by the finding of the Board of General Appraisers, and their decision is therefore affirmed.

It is true that in that case the contention was not made by the importer that the importation was an iron ore, and this detracts somewhat from the force of the decison as bearing upon that question, but it is authority for the proposition that the present importation is a color and properly assessed as such.

The question next arose in the case relied upon by the importers, Francklyn *v.* United States (119 Fed. Rep., 470). In that case the

statement of facts shows that the merchandise in question was a crude mineral product. The statement of the court is—

> In its present state it can not be used as a pigment or color, and, even if it be assumed that it is in fact a color or pigment, then it is a color specially provided for as iron ore in paragraph 121—

but relies for its authority upon the case, G. A. 1312 (T. D. 12663), from which we have quoted above, and which rested upon the fact that the ore was in a crude state, and not as imported, usable as a color.

So in Hill v. Francklyn (162 Fed. Rep., 880) the court, following the decision in 119 Federal Reporter, 470, concluded its opinion as follows:

> Witnesses more or less experienced in handling similar merchandise have applied to it such inconclusive terms as "crude pigment," "dry material or dry coloring matter suitable for making paint," and the like; but that it is "in fact crude hematite ore, or iron ore," which "in its present state can not be used as a pigment," is no less evident now than it was when Judge Townsend found it to be so.

It will be seen, therefore, that the cases on which appellant relies are cases dealing with the crude product, iron ore, which requires something to be done to it before being fitted for use as a color.

One other case relied upon is a board case, G. A. 5267 (T. D. 24189), in which it is said that T. D. 22057 appears to be overruled. But when we turn to what is decided we find that the board quotes from the opinion by Judge Townsend as follows:

> The merchandise is, in fact, crude hematite ore or iron ore. In its present state it can not be used as a pigment or color, and even if it be assumed that it is, in fact, a color or pigment, then it is a color, specially provided for as iron ore in paragraph 121. Congress having seen fit to levy a duty of 40 cents per ton on iron ore without qualification as to its use, and without limitation, not specially provided for, such designation must stand.
>
> Following this decision, we sustain the claim of the protests that the merchandise is properly dutiable at the rate of 40 cents per ton under paragraph 121. * * *

It does not appear very clearly whether in this case the importation was in its native state, or had been advanced to the condition in which the present importation is. If in the latter form the case (T. D. 24189) indicates that the decision of Judge Townsend in the Francklyn case was misapplied. It is obvious that the Francklyn cases should not be construed as applying to anything other than crude iron ore suitable for smelting purposes.

The testimony in this case discloses that the importation considered in the Francklyn cases contained the natural lumps, which made it amenable to treatment by the smelting process, and it further appears that before such ores can be used as a coloring pigment they must go through a process similar to that which has been resorted to by the importers in the present case, at a cost, in this country, of from $8 to $15 a ton.

The only remaining question is whether this product is a color or pigment within the meaning of paragraph 58. We have no hesitancy in holding that it is. The evidence on the part of the Government did show that it is used indeed as a filler for these boards, but that the primary use is to give it a color. It is evident that it would not be used as a filler except for the fact that it does impart color. There is also testimony that it has been sold to be mixed with paints, the chief use, however, being to give a color to fiber board. This does not prevent the application of paragraph 58, as is illustrated by our recent decision in the Drakenfeld case (2 Ct. Cust. Appls., 512; T. D. 32247).

The decision of the Board of General Appraisers is *affirmed.*

SMITH, Judge, did not sit in this case.