**VOLKSWAGEN OF AMERICA, INC.**
v.
**UNITED STATES.**
**Protest No. 67/16113-29866-66.**

United States Customs Court,
First Division.
March 30, 1972.

Donohue & Shaw, New York City (Joseph F. Donohue, New York City, of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Herbert Peter Larsen, New York City, trial atty.), for defendant.

Before WATSON, MALETZ, and RE, Judges.

WATSON, Judge:

This protest places in issue the classification of certain paints imported from Germany in 1966 and designated on the invoices as types "LKL" and "L". Various additional numerical suffixes designate the particular color.

The importations were classified pursuant to item 409.00 of the Tariff Schedules of the United States as "[m]ixtures in whole or in part of any of the products provided for in" schedule 4, part 1C of the TSUS and assessed with duty at the rate of 7 cents per pound plus 45 per centum ad valorem. Plaintiff claims the proper classification should be pursuant to item 405.25 of the TSUS as "[p]lastics materials" dutiable at the rate of 2.8 cents per pound plus 18 per centum ad valorem. Plaintiff also made an alternate claim pursuant to item 774.60 of the TSUS for classification as other "[a]rticles not specially provided for, of rubber or plastics" dutiable at the rate of 17 per centum ad valorem. Still another alternative claim for classification pursuant to item 445.40 was abandoned at the trial and is accordingly dismissed.

The statutes involved herein, together with the relevant headnotes, are as follows:

Tariff Schedules of the United States (19 U.S.C. § 1202):

*Schedule 4 headnotes*:

\*    \*    \*    \*    \*    \*

3. (a) The term *"mixtures"*, as used in this schedule, means substances consisting of two or more ingredients (i. e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i. e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

\* \* \* \* \* \*

Schedule 4, Part 1, Subpart C

*Subpart C headnotes*:

1. The provisions of this subpart providing for products obtained, derived, or manufactured in whole or in part from products described in subparts A or B of this part shall also apply to products of like chemical composition having a benzenoid, quinoid, or modified benzenoid structure artificially produced by synthesis, whether or not obtained, derived, or manufactured in whole or in part from products described in the said subpart A or B.

\* \* \* \* \* \*

3. The term *"plastics materials"* in item 405.25 embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules,

solutions, emulsions, and other basic forms not further processed.

4. The term *"plasticizers"* in item 405.40 means substances which may be incorporated into a material (usually a plastic, resin material, or an elastomer) to increase its softness, flexibility, workability, or distensibility.

\* \* \* \* \* \*

*Claim*:
Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:
\* \* \* \* \* \*
405.25 Plastics materials ........ 2.8¢ per lb. + 18% ad val.

*Classification*:
409.00 Mixtures in whole or in part of any of the products provided for in this subpart ... 7¢ per lb. + 45% ad val.

Two witnesses testified on behalf of plaintiff. Mr. Klaus Koenn, the head of Volkswagen's paint manufacturing operation and deputy manager of the processes department and Dr. Gert Schumann, a chemist for the Vianova Kunstharz A. G. of Austria, a manufacturer of synthetic resins and a consultant to Volkswagen since 1964. Richard E. Perkins, a director of eastern area technical laboratories for paint, varnish and lacquer of the Sherwin-Williams Company, testified for defendant.

The testimony of these witnesses established the following facts regarding the importation. The importations are manufactured by third party manufacturers in accordance with technical specifications issued by Volkswagen. The process of manufacture takes place in the following sequence. Powdered pigments are added to the alkyd resins, which are in solution. Solvents are then added to keep the resins in solution and maintain the desired viscosity. Fine mixing takes place, in which the particle size of the pigments is reduced below 10 microns. The paste is then transferred to temporary containers to which additional vehicles and solvents are added in accordance with the desired characteristics of the finished product. The material is then filtered. In both types of

paint, the "vehicle", that is to say the carrying body of the importation, is an alkyd resin, a synthetic benzenoid material obtained by condensation between natural oils and synthetic fatty acids in connection with polyfunctional alcohols and organic acids such as phthalic anhydride. Both types contain pigments of an organic or inorganic origin which are used to bring about the desired colors, type L containing between 4 to 10 percent pigments and type LKL containing between 10 to 24 percent pigments. Both types contain solvents used in a function which can best be described as that of a thinner to bring the substance into a dissolved state and provide the degree of viscosity necessary to facilitate application. Type L contains between 57 to 63 percent solvents and type LKL contains between 43 to 48 percent solvents. Both types also contain additives used to modify the properties of the importation in accordance with the requirements of their use. These additives are siccatives or melamine resins or high boiling point solvents, used to control the surface behavior of the importation in its form as a wet film. In the case of type L, cellulose nitrate accelerates the air-drying by means of solvent evaporation. The percentage in type L ranges between 10 to 12 percent. In type LKL, the metal salt of an inorganic acid accelerates its drying.

In commencing our discussion, it is clear first that there is no dispute as to the importations' use, in the coating of automobile parts, and in their composition set forth above. The dispute centers on whether the importations, forced within the bounds of the provision for articles in part of benzenoid origin by reason of their ingredients, are more specifically provided for within that provision as plastics materials or simply as mixtures.

■ Plaintiff's witnesses have expressed the view that the importations meet with their understanding of the term plastics materials set forth in the tariff schedules. Although such testimony is of some use, it is not sufficient to establish a prima facie case regarding the meaning of the term plastics materials. That is a matter for the court to determine, not just from testimony but from the exercise of its interpretive powers.

As a result of our full analysis of the claimed provision, we are led to conclude that the term "plastics materials" used in the TSUS describes the importations and, within the ambit of Part 1, describes them more accurately than the provision for mixtures.

Defendant defends the classification on a number of grounds, first, a decision under a prior tariff act in which similar paint was held classifiable pursuant to the "benzenoid" mixtures provision then in effect, second, a sustained continuity of rates in the "benzenoid" mixtures provisions of the various tariff acts, third, an established customs classification practice by which similar importations were classified pursuant to the "benzenoid" mixtures provision of the 1930 Act and continue to be classified in a descendant provision of the TSUS and fourth, a statement in the 1968 Summaries of Tariff Information that " * * [p]aints which contain benzenoid ingredients, such as the alkyd paints, are covered by other item numbers, chiefly item 409.00. * * * "

Defendant also attacks the claimed provision on a number of grounds which we will discuss later.

The first three lines of defense set out above, are weakened by the fact that prior to the TSUS there was no statutory language for "plastics materials". The decision in Kuttroff, Pickhardt & Co., Inc. v. United States, 21 CCPA 332, T.D. 46864 (1934), establishes the primacy of the "mixture" provision of paragraph 28 of the Tariff Act of 1922 only vis-á-vis the provision for paint in paragraph 68 of that act. At most, that case stands for a proposition not in dispute here; that even the least specific provision in the "benzenoid" portion of the tariff act will control the classification of an article which is of benzenoid origin.

■ The continuity of rates between the provisions under which the paint in the *Kuttroff* case was classified and that under which the importations herein were classified, is not dispositive of the scope of the current provision for mixtures. At best continuity of rate will supplement and support a more fundamental finding that the specific language of a provision should control the classification. National Polychemicals, Inc. v. United States, 433 F.2d 1327, 58 CCPA 37, C.A.D. 1001 (1970). As was said in that case, the continuity of rate " * * * *may* be 'a significant factor' in classifying the imported goods —although far from a dispositive factor." [1] It would be drastic and unprecedented if mere continuity of rate protected a residual mixtures provision from close scrutiny and dissuaded the court from dealing with the meaning of new, and potentially more specific, statutory language.

The customs classification practice prior to the tariff schedules,[2] is of no relevance inasmuch as it was a practice which developed in the absence of language covering "plastics materials". Classification practice subsequent to the enactment of the tariff schedules [3] must be given some weight inasmuch as it is the interpretation of the statute by the agency entrusted with its administration.[4] Nevertheless, such interpretation is not controlling particularly in view of this court's duty to explore the meaning of new terms in the statute and in light of the fact that the Customs Bureau position seems to have been merely a continuation of prior classification without specific consideration of the impact of the new term "plastics materials".

Finally, the opinion in the 1968 Summaries of Tariff Information that such importations are chiefly covered by item 409.00 is of no weight. The Summaries of Tariff Information are of no use as a guide to the scope of provisions or legislative intent in *prior* tariff acts. Dodge & Olcott, Inc. v. United States, 45 CCPA 113, C.A.D. 683 (1958).[5]

In the *Dodge & Olcott* case, the 1948 Summaries of Tariff Information specifically commented on the issue in question in a manner which would have been determinative. The CCPA, at pages 116–117, stated as follows:

It appears to us that a compilation prepared by some unidentified person, for a Congressional Committee, *after* the involved laws have been enacted, is not necessarily controlling in determining the intent of the enactors of the statute or negotiators of a treaty. At best, the Summary is an opinion or conclusion of some person or persons not necessarily reflecting the intent of the enactors or negotiators. It is *our* task to say what effect G.A.T.T. [General Agreement on Tariffs and Trade] had on the duty on safrol and we are not influenced by the opinion of someone unknown, presumably based on no better information than we have. There is not in this case any question of legislative adoption of the opinion expressed in the

---

1. In the case of United States v. Andrew Fisher Cycle Co., Inc., 426 F.2d 1308, 57 CCPA 102, C.A.D. 986 (1970), the CCPA utilized an argument from continuity of rate. There, however, neither of the competing provisions was a new one, in which circumstance continuity of rate may justifiably have more weight.

2. 95 Treas.Dec. 30, T.D. 55027(13) (1960); 95 Treas.Dec. 158, T.D. 55097 (12) (1960).

3. 99 Treas.Dec. 341, T.D. 56190(146) (1964); 99 Treas.Dec. 390, T.D. 56199 (49) (1964); 101 Treas.Dec. 374, T.D. 66–128(35) (1966).

4. See, e. g. Mattel, Inc. v. United States, 65 Cust.Ct. 616, 621, C.D. 4147 (1970).

5. But see, Tanross Supply Co., Inc. v. United States, 433 F.2d 1332, 58 CCPA 26, C.A.D. 1000 (1970), where in footnote 8, in reference to a similar situation the CCPA refers with a degree of approval to the "authority" of the 1968 Summaries of Tariff Information. Cf. Rausch v. Nelson, 134 N.W.2d 519 (Sup.Ct.N.D. 1965). See W. R. Filbin & Co., Inc. v. United States, 306 F.Supp. 440, 63 Cust. Ct. 200, 212, 213, 214, C.D. 3897 (1969).

Summaries, or of any treaty made on the basis thereof. [Emphasis in original.]

Accordingly, we treat the statement in the 1968 Summaries that benzenoid paints are chiefly covered by item 409.-00 as an opinion without influential force or effect.

It is important to recognize two types of material useful in statutory interpretation, that which sheds light on legislative intent and that which conveys the interpretation made by the agency responsible for administering the statute. The Summary of Tariff Information falls into neither category insofar as a prior tariff act is concerned. It cannot reveal legislative intent because it was not considered by the legislators. It cannot evince the interpretation of the agency responsible for applying the statute because the Tariff Commission is not that agency. At best it is secondhand evidence of a most general nature regarding the interpretation placed on a term by the Customs Bureau. Since that is the origin of the dispute, it is hardly the source for a determinative resolution.

The entire justification for the use of such materials is " * * * the fact that they were brought to the attention of the legislature and by the probability that it intended to adopt the views embodied therein when it enacted the Committee's recommendations into law." [6] Sutherland, Statutes and Statutory Construction § 5006 (1943).

Courts, in attempting to discover legislative intent, by examining such things as the revisor's notes to new legislation and the question of legislative awareness of judicial decisions, invariably are concerned with the chronology of events; namely that the history they speak of be prior to passage of the act in question. United States v. National City Lines, Inc., et al., 337 U.S. 78, 82, 69 S.Ct. 955,

93 L.Ed. 1226 (1949). Even the most comprehensive and far-reaching discussions of legislative history have not gone into events occurring after the act in question except as to behavior by Congress which might indicate acquiescence to an administrative practice. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 308, 313, 53 S.Ct. 350, 77 L.Ed. 796 (1933). See also, Textile Printing & Finishing Co., Inc. v. United States, 49 CCPA 24, 27, C.A.D. 789 (1962); United States v. Durst Mfg. Co., Inc., 46 CCPA 74, 77, 78, C.A.D. 700 (1959); United States v. J. Eisenberg, Inc., 43 CCPA 105, 107, 108, C.A.D. 616 (1956).

▮ The determination of legislative intent from material issued after passage of the act in question can be permitted only in the most exceptional instances and with reference to clarifications by the same Congressional Committee which considered the statute at the enactment. Sioux Tribe of Indians v. United States, 316 U.S. 317, 329, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942).

Our appellate court has on two occasions sanctioned the use of exegetical material published subsequent to the enactment of the statutory language in question. Rifkin Textiles Corp. v. United States, 54 CCPA 138, C.A.D. 925 (1967); National Polychemicals, Inc. v. United States, supra. The materials involved were from the Fifth and Seventh Supplemental Reports made by the Tariff Commission to the President and Congress pursuant to section 101 of the Tariff Classification Act of 1962 and issued within $1\frac{1}{4}$ years of said Act.[7] In the face of prevailing opinion on this subject, we are unwilling to extend this practice to exegetical material which appeared considerably later than the Supplemental Reports and is the work of a body other than the Congressional Com-

---

6. This is the view expressed regarding reports of special committees of the legislature which must a fortiori apply all the more strictly to commissions composed of non-legislators.

7. The Fifth Supplemental Report was issued on May 16, 1963. The Seventh Supplemental Report was issued on August 14, 1963.

mittee responsible for drafting the legislation in question.

█ In short, the Summaries of Tariff Information are not part of the legislative history of a prior act nor are they the interpretation of the agency empowered to apply the act and therefore have little, if any, weight in determining the meaning of prior statutory language.

We turn now to the major issue in this case, the meaning of the term "plastics materials". Plaintiff argues that the importation falls within the plain and common meaning of this term. Defendant argues that the provision for plastics materials is a direct descendant of a portion of paragraph 28(a) of the Tariff Act of 1930, first set out separately in Presidential Proclamation 2929, 86 Treas. Dec. 138, T.D. 52739 (1951), in a paragraph reading as follows:

> Synthetic phenolic resin and all resin-like products prepared from phenol, cresol, phthalic anhydride, coumarone, indene, or from any other article or material provided for in paragraph 27 or 1651, Tariff Act of 1930, all these products whether in a solid, semisolid, or liquid condition, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651, Tariff Act of 1930. . . . * * *

█ Defendant contends that the term "plastics materials" is simply a substitution for the complicated terminology of the above provision with the language of derivation moved to the main superior heading of item 405.25 and the complicated terminology moved to the headnote and clarified. Consequently, defendant argues that the provision for plastics materials should have no more scope than did its ancestor. This is essentially an argument that the scope of descendant provisions remains the same even if their language is changed absent any additional indications of intent to change their scope.

█ It is our opinion, however, that "heredity" is not a determinative factor in statutory interpretation, particularly when there has been a change of language. Here there has been an entire rephrasing and restructuring of the statutory provision, a circumstance which always warrants a fresh determination of meaning free of the influence of old decisions, interpretations and administrative practices. Strouse, Adler & Co. v. United States, 3 Ct.Cust.Appls. 184, 186, T.D. 32466 (1912); United States v. New York Cordage Co., 18 CCPA 23, 25, 26, T.D. 43977 (1930); Rice Millers' Association, American Manufacturers v. United States and Oberle (Inc.), 15 Ct. Cust.Appls. 355, 358, T.D. 42560 (1928); Cellas (Inc.) v. United States, 18 CCPA 237, 241, T.D. 44405 (1930). In any event, the use of a significant new term is more than enough reason to justify a full examination of the new language in its own right.

█ Turning to this examination, we find that the plain meaning of the term "plastics materials" covers the importations at issue. They are materials with which a plastic entity is made. The fact that the entity is in the form of a coating and not an independently structured article, makes no difference. Nor does the fact that they might also be commonly described as paint detract from the finding that within the "benzenoid" part of the tariff schedules where they must be classified due to their composition, they are best described as plastics materials.

Defendant emphasizes the presence in the importations of siccatives to accelerate the drying, claiming the headnote does not permit such additives. We take a different view of the headnote, influenced by its markedly flexible approach in the permissible origin and form of the material. In a statutory context which places primary emphasis on the general term "plastics materials" and phrases a headnote characterized by an inclusive tone and intent, the mention of plasticizers, fillers, colors or extenders is not

an exact and rigid list of permissible additives.

The general intent is to permit additives which do not change the nature of the plastics material or modify it to the extent where it is a more advanced product. The addition of siccatives or drying agents does no more to change its nature than does the addition of the named additives. In fact, the drying agents can be viewed as a logical and necessary complement to the plasticizers serving to foster the loss of plasticity which is an inevitable accompaniment of the formation of a plastic entity. Despite the presence of siccatives, the importations remain primarily and predominantly plastics materials.

Defendant also argues that the importations are "further processed" beyond the form permitted by the headnote by reason of the addition of further solvents and filtering after the initial mixture of color, solvents and synthetic resin. In our view, the steps referred to are all part of the unified process of producing a plastics material. The process of manufacture concludes at a point where the importations are in a state and form envisioned by the headnote.

In sum, the importations fall clearly within the common and most explicit meaning of the term plastics materials. The extensive discussion of prior legislation and legislative history, although not relied on in the end, was necessary to reach the final conclusion that the scope of the term plastics materials is exactly what it appears to be, uncomplicated by special or unusual legislative restrictions on its plain meaning.

For the above reasons, we find that the importations are accurately described by the term plastics materials in item 405.25, a provision distinctly more specific than the provision in item 409.00. The importations are therefore properly classifiable as plastics materials dutiable at the rate of 2.8 cents per pound plus 18 per centum ad valorem.

Judgment will issue accordingly.