(C.D. 4369)

VERONA DYESTUFFS DIV. OF VERONA-PHARMA CHEMICAL CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 26, 1972)

*Sharretts, Paley, Carter & Blauvelt* (*Louis Schneider* of counsel) for the plaintiff.

*Harlington Wood, Jr.,* Assistant Attorney General (*Herbert P. Larsen,* trial attorney), for the defendant.

Before WATSON, MALETZ and RE, Judges

WATSON, Judge: These protests,[1] consolidated for the purpose of trial, place in issue the classification of certain urethane pastes, which were classified pursuant to item 409.00 of the Tariff Schedules of the United States as "mixtures in whole or in part of any of the products provided for" in schedule 4, part 1C, TSUS, and were assessed with duty at the rate of 7 cents per pound plus 45 per centum ad valorem.

An original claim in the protests for classification pursuant to item 406.50 as "colors, dyes, and stains (except toners)" has not been pursued by plaintiff, is deemed abandoned, and is accordingly dismissed. The claim which has been pressed by plaintiff is that the merchandise is classifiable pursuant to item 405.25 of the Tariff Schedules of the United States as "plastics materials" dutiable at the rate of 2.8 cents per pound plus 18 per centum ad valorem.

The relevant statutory provisions read as follows:

SCHEDULE 4. – CHEMICALS AND RELATED PRODUCTS

Schedule 4 headnotes:

\* \* \* \* \* \* \*

3. (a) The term "mixtures", as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

(b) The term "mixtures", as used in this schedule, includes solutions, except solutions defined as compounds in headnote 2(b) of this schedule.

PART 1. – BENZENOID CHEMICALS AND PRODUCTS

\* \* \* \* \* \* \*

Subpart C. – Finished Organic Chemical Products
Subpart C headnotes:

\* \* \* \* \* \* \*

3. The term "plastics materials" in item 405.25 embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not

---

[1] The merchandise covered by protest 66/69458 was liquidated less than sixty days after appraisement. In this regard, we adhere to the decision in *John V. Carr & Son, Inc.* v. *United States,* 66 Cust. Ct. 316, C.D. 4209, 326 F. Supp. 973 (1971), in considering the liquidation valid and the protest based thereon timely.

limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

\* \* \* \* \* \* \*

Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

\* \* \* \* \* \*

405.25 Plastics materials------------------ 2.8¢ per lb. + 18% ad val.

409.00 Mixtures in whole or in part of any of the products provided for in this subpart___ 7¢ per lb. + 45% ad val.

The parties have stipulated that the merchandise consists of a polyester derived from adipic acid, a color, and tributyl phosphate and that the adipic acid is a chemical product obtained from a product provided for in schedule 4, part 1, subpart A or B. The red urethane paste is colored by a red benzenoid color while the black paste is colored by carbon black.

The official papers in these cases were introduced in evidence without being marked. Two United States customs laboratory reports, one pertaining to the shipment of urethane black paste and the other to the shipment of urethane red paste, were introduced in evidence as joint collective exhibit 1A.

The facts of this case, as revealed by the laboratory reports and the testimony of plaintiff's two witnesses, are not in dispute. Urethane red paste contains 16 percent organic pigment, 73 percent polyester resin and 11 percent tributyl phosphate, a plasticizer. Urethane black paste contains 16 percent carbon black, 75 percent polyester resin and 9 percent tributyl phosphate. It appears that a whole range of urethane pastes exists differing from one another only in the pigment present in the mixture.

The polyester resin, representing approximately 75 percent of the imported article, is a polymerization condensation product of 1,3 butyl diol and adipic acid, known by its trade name of Ultramoll. The percentage of pigment present in the importations appears to be the maximum amount which can be introduced and still allow the importation to perform its function in the manufacture of plastics. The importation is in the form of a highly viscous liquid. It can be made into a plastic article directly or after having been extended with other ma-

terials such as polyesters and polyethers.[2] Certain examples of plastic articles made from the importations were introduced in evidence. They included a polyurethane polyester foam (made by the addition of toluylene diisocyanate, emulsifier and catalyst to the urethane black paste), test forms made by a molding process (utilizing the importation together with a cross linker, a catalyst and diisocyanate), a test form made by injection molding (utilizing the importation as extended with an equal quantity of liquid polyester to which are added a cross linker and a diisocyanate, the whole used to produce a sheet form which is then cut into pellets for use in the injection molding machine), and samples of film made by a mold process (utilizing the importation together with a cross linker, a catalyst and diisocyanate).

In all these applications the importation plays a dual role. It participates in the formation of the plastic article by introducing its polymeric content and it introduces color into the final product.

There can be no doubt that the importation falls within the literal scope of the term "plastics materials" as explained in headnote 3 of subpart C, *supra*. There is no question it is a product formed by the condensation of organic chemicals to which a plasticizer and color have been added. In addition, it is in the prescribed basic form, in this case a liquid condition.

Defendant seeks to counter the apparent inclusiveness of the claimed provision by stressing the pigment content of the importations. Defendant argues that the merchandise "* * * does not seem to be material for manufacture of plastics articles, *per se*, but a highly concentrated means of supplying coloration to other plastics materials." (Footnote omitted.) As such, defendant contends the importations are additives to other plastics materials rather than "ingredients" or plastics materials in their own right.

We cannot subscribe to defendant's analyses of the imported material. Although pigment is present, indeed to the maximum extent possible, it does not exceed 16 percent of the mixture. Approximately 75 percent of the mixture consists of an undisputed plastics raw material, namely, polyester resin. Defendant raises the disconcerting prospect that too literal a reading of the claimed provision will permit classification thereunder of an importation which is in large part color or plasticizer with a minimal presence of polyester resin. That, however, is not the situation herein since the quantity of polyester resin in the importation is sufficient to the formation of plastic articles by itself, without the use of additional plastics materials. That it may not be used in this manner does not detract from its fundamental capabilities for use.

---

[2] In all cases the addition of isocyanates is required to make polyurethane plastics.

It cannot be said that the presence of pigments is of an extent which negates the overall characteristics of the importation. In short, the importation is a material used for the manufacture of plastic articles which possesses additional desirable characteristics of coloration and plasticity, none of which are so dominant as to detract from its fundamental nature and none of which are outside the bounds of the statutory headnote.

It should be noted, of course, that by no means do we suggest that a product whose primary purpose and basic nature is that of a coloring agent without a significant or meaningful admixture of plastic raw materials will come within the purview of the provision for "plastics materials". This does not mean, however, that products such as the instant importations, which possess dual characteristics deriving from a substantial presence of plastic raw materials, colors and plasticizers, should be excluded from the coverage of the claimed provision.

For the above reasons we conclude that the importations are in and of themselves plastics materials and are more specifically provided for as such pursuant to item 405.25 of the Tariff Schedules of the United States rather than as mixtures pursuant to the general provision of item 409.00.

Judgment will issue accordingly.