**The UNITED STATES, Appellant,**

v.

**MOBAY CHEMICAL CORPORATION, Appellee.**

**Appeal No. 77–24.**

United States Court of Customs and Patent Appeals.

May 18, 1978.

---

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Chief Customs Section, Herbert P. Larsen, New York City, for the United States.

Sharretts, Paley, Carter & Blauvelt, New York City, attorneys of record, for appellee, Peter Jay Baskin, Donald W. Paley, Gail T. Cumins, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

MARKEY, Chief Judge.

The Government appeals from summary judgment of the United States Customs Court, 78 Cust.Ct. 1, C.D. 4685, 435 F.Supp. 1217 (1977), sustaining Mobay Chemical Corporation's (Mobay's) classification pro-

test relating to imported urethane pastes.[1] The Customs Court held that proper classification was under item 405.25, TSUS, as "Plastics materials." We reverse and remand.

## Issues

The decisive issue is whether the Customs Court erred in determining the absence of genuine issue of material fact. A second issue is whether the Customs Court lacked jurisdiction in three cases instituted by attorneys for Mobay's predecessor, Verona Corporation, after that corporation had been merged and dissolved.

## Statute

The TSUS and pertinent headnote provisions are:

SCHEDULE 4.—CHEMICALS AND RELATED PRODUCTS

Part 1.—Benzenoid Chemicals and Products

Subpart C.—Finished Organic Chemical Products

Subpart C headnotes:

\* \* \* \* \* \* \*

3. The term "plastics materials" in item 405.25 embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

\* \* \* \* \* \* \*

Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

| | |
|---|---|
| \* \* \* \* \* \* \* | |
| 405.25 | Plastics materials . . . . . . . . . . . . . . . . . |

Colors, dyes, stains, and related products:

| | |
|---|---|
| \* \* \* \* \* \* \* | |
| 406.50 | Colors, dyes, and stains (except toners), whether soluble or not in water, obtained, derived or manufactured in whole or in part from any product provided for in subpart A or B of this part . . . . . . . . |
| \* \* \* \* \* \* \* | |
| 406.70 | Color lakes and toners, obtained, derived, or manufactured in whole or in part from natural alizarin, natural indigo, or any product provided for in subpart A or B of this part . . . . . . . . . . . . . . . . . . . . |

## The Imported Merchandise

The urethane pastes are imported in liquid form and consist of a polyester resin derived from adipic acid, a coloring pigment, and tributyl phosphate, a plasticizer. Adipic acid is admittedly a chemical product obtained from a product provided for in Schedule 4, part 1, Subpart A or B as required by the superior heading to item 405.25. The urethane pastes are manufactured by Bayer AG of West Germany by mixing polyester resin and a coloring pigment in a machine called a kneader. Different coloring pigments are added to achieve different colors in the pastes.[2]

## Statements of the Parties

Mobay and the Government submitted statements of material facts, which statements were in essential conflict respecting the use to which the pastes are put.

Mobay alleges that the urethane pastes "can be made into a plastic article directly or after having been extended with other materials such as polyesters and polyethers." The government asserts:

---

1. This appeal involves a consolidation of seventy protests and one civil action. The initial, claimed, and alternative classifications in these cases involved items 409.00, "Mixtures \* \*;" 406.50, "Colors, dyes, and stains \* \* \*;" 406 70, "Color lakes and toners \* \* \*;" and 405 25, "Plastics materials." On this appeal, the competing provisions are 406.50 and 406.70 on the one side and 405.25 on the other.

2. The government has conceded that urethane white and black pastes are properly classifiable under item 405.25. At oral argument the government explained that white and black pastes contain no benzenoid pigments.

The imported merchandise is not made into plastics articles, but is used to color plastics materials which are made into plastics articles of a desired color. The imported merchandise is a color which is added to plastics materials at very low ratios. Although theoretically capable of transformation into a plastics article directly, defendant [government] has discovered not a single instance of commercial utilization of this theoretical capability.

Mobay's second contested allegation is that "the urethane pastes play a dual role by introducing polymeric content and color into the final product." The government responds:

The urethane pastes are not used to form plastics articles, but only to color them. Thus, the urethane pastes play only a single role. The only purpose of the polymeric content of the merchandise is to facilitate the introduction of the pigment into plastics materials so as to produce plastics articles of a particular desired color.

The third contention challenged by the government is that: "[t]he imported merchandise is a product formed by the condensation of organic chemicals to which a plasticizer and color have been added," to which the government responds:

The merchandise is a pigment to which polymer and plasticizer have been added. The sole purpose for the addition of polymer and plasticizer is to render the pigment compatible with the plastics material it is used to color.

The government also denied Mobay's assertion that the issues raised in the present case were decided in *Verona Dyestuffs Div.* of *Verona-Pharma Chemical Corp. v. United States,* 69 Cust.Ct. 26, C.D. 4369 (1972).[3]

Having submitted a number of affidavits concerning actual use of the urethane pastes, the government alleged that the following are issues of material fact which must be determined at trial:

1. The imported merchandise is a product whose primary purpose and basic nature is that of a coloring agent.

2. The merchandise does not contain a commercially significant or meaningful admixture of plastic raw materials.

3. The merchandise is coloring additives to other plastics materials, and contains only sufficient polymer and plasticizer to expedite and accomplish its purpose as a coloring agent.

4. The merchandise is a color toner, classifiable under item 406.70, Tariff Schedules of the United States (TSUS).

All were denied by Mobay. Regarding issues 1 and 2, Mobay says that both were determined in *Verona, supra,* i. e., the pastes perform a dual role of forming plastic articles and introducing color to the articles, and that plastics raw materials constitute a commercially significant quantity (approximately 75 percent) of the pastes. On issue 3, Mobay relies upon its initial contention that the pastes can be made into a plastic article directly or combined with other materials such as polyesters or polyethers. Issue 4, Mobay says, is an issue of law, not fact.

*The Affidavits*

Some of the government's affidavits are from executives of corporations which were

---

**3.** In *Verona*, the merchandise at issue differed from the present pastes only in amount and color of pigment used. The pastes in *Verona* were classified under item 409.00, TSUS, as benzenoid mixtures. Proper classification was held by the court to be under item 405.25, TSUS, because the pastes had the ability to form plastic articles by themselves. Unlike *Verona*, the present case involves a comparison between the benzenoid plastics material provision, item 405.25, and the benzenoid color provision, items 406.50 and 406.70.

customers of Mobay's predecessor, Verona Corporation. In general, the affidavits attest to the sole use of the imported pastes as coloring agents in urethane foam and assert that the polymer in the pastes is commercially insignificant. Moreover, the affidavits reflect a view that the pastes are not used by themselves to form final plastic articles.

### Customs Court

#### (a) Classification

The court granted Mobay's motion for summary judgment relying on its decision in *Verona, supra.* The deciding factor in *Verona,* the court said, was the capability of the pastes to form plastic articles by themselves and, therefore, the pastes fell literally within the plain meaning of the "Plastics materials" provision (item 405.25) regardless of whether the pastes had a high pigment content. Thus, according to the court, even if the pastes were used exclusively as coloring agents, the pastes were "more than" colors and, accordingly, were properly classifiable under item 405.25. The court noted that the color provisions of the TSUS would include coloring agents in "pure" form and in other forms lacking sufficient polymer content to make plastic articles.

#### (b) Jurisdiction

The Customs Court granted Mobay's motion to substitute Mobay Chemical Corporation for Verona Corporation in the three cases around which the jurisdictional issue revolves. In its opinion, however, the court dismissed those actions because they had been initiated by Verona Corporation after it had been dissolved. In the court's view, Mobay was not a party whose protest had been denied, had no relation to the underlying customs transaction, and could not maintain the present actions. The court stated that the situation was similar to *Parksmith Corp. v. United States,* 77 Cust.Ct. 102, C.D. 4678 (1976). After review of subsequently filed motions and memoranda, and without comment, the court vacated the dismissal of the three involved cases and entered an order requiring classification of the imported pastes under item 405.25.

### OPINION

#### (a) Classification

Mobay argues: (1) *Verona* established that the decisive factor for classification under item 405.25 was whether the pastes have the ability to form plastic articles by themselves; (2) it is admitted that the present pastes have that ability; (3) therefore, there is no material fact issue to be determined, the use to which the pastes are put being irrelevant.

■ *Verona* was not appealed to this court and has no binding effect upon our determination. Moreover, we disagree with the court below that the pastes are classifiable under item 405.25 solely because they have an ability to form plastics articles. That single criterion is too broad.

■ Mobay further argues that the pastes cannot be classified within items 406.50 or 406.70 because the pastes are "more than" colors. As this court recently said, however: "To say that an article is 'more than' that described by a particular tariff provision is to say little more than that, in the opinion of the court, the provision cannot be interpreted to cover it." *The Englishtown Corp. v. United States,* 64 CCPA ——, C.A.D. 1187, 553 F.2d 1258 (1977). The sole basis for the Customs Court's determination that the present pastes are "more than" colors is that they have the ability to form plastics articles by themselves.

The government alleges that the ability to form plastic articles is due to the presence of plasticizers and resins which are in fact used solely to make the pastes compatible with other materials. Nothing of record indicates that the "color" provisions do not cover coloring pigments admixed with

other ingredients which permit the pigments to be compatible with materials to be colored. In short, on this record, we disagree with the court below that the pastes are so much "more than" colors as to preclude classification under items 406.50 or 406.70.

As the Customs Court determined, the pastes do fall within the headnote 3 description of "plastics materials," and thus within the description of item 405.25.[4] The pastes, however, also fall within the description of "Colors, dyes, and stains," item 406.50, and "Color lakes and toners," item 406.70.

Classification of an article falling within the literal description of two or more items is governed by General Interpretative Rule 10(c):

> [A]n imported article which is described in two or more provisions * * * is classifiable in the provision which most specifically describes it; but * * *:
>
>   *   *   *   *   *   *
>
> (ii) comparisons are to be made only between provisions of coordinate or equal status, i. e., * * * the primary * * headings * * *.

The primary headings requiring comparison in the present case are:

> Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:
>
>       and
>
> Colors, dyes, stains, and related products:

■ The government argues that the color provisions are more specific than the "Products obtained" provisions. Mobay has not argued otherwise. Though we agree that the color provisions can be considered as more specifically describing the article than a general descriptive provision encompassing such diverse products as explosives

(item 405.04), ink powders (item 405.10) and pesticides (item 405.15), we rest our decision in the present case on consideration of items 406.50 and 406.70 as use provisions.

The government has pointed out, and Mobay has not denied, that tariff provisions for colors and color toners have long been considered use provisions. *Illfelder & Co. v. United States,* 7 Ct.Cust.Appls. 53, T.D. 36311 (1916); *Collins & Co. v. United States,* 3 Ct.Cust.Appls. 83, T.D. 32356 (1912); *Drakenfeld & Co. v. United States,* 2 Ct.Cust.Appls. 512, T.D. 32248 (1912); *De Ronde v. United States,* 1 Ct.Cust.Appls. 104, T.D. 31112 (1910). Between a general descriptive provision and a provision for a specific use, we consider the use provision here to be more specific.

■ Not every issue of fact is "material," and thus capable of precluding summary judgment. In the present case the Customs Court considered the issue touching the use made of the imported pastes as immaterial, holding classification proper under item 405.25 even if it were shown that the imported pastes were solely used as colors. Arguing merely that the issue is irrelevant, Mobay has neither admitted nor denied that the imported pastes are used only as colors, and must on the present record be considered as having denied the government's allegation that they are so used. For the reasons stated, we have concluded that the use made of the imported pastes constituted an issue of fact material to determination of proper classification in this case; that if the pastes are used only as coloring agents, the proper classification should be under either item 406.50 or 406.70; and that the grant of summary judgment was therefore in error.

### (b) Jurisdiction

Jurisdiction is accorded the Customs Court, 28 U.S.C. § 1582, to determine:

---

4. Note the broad reading of the "plastics materials" provisions in *Volkswagen of America, Inc. v. United States,* 68 Cust.Ct. 122, C.D. 4348, 340 F.Supp. 983 (1972), *aff'd per curiam,* 61 CCPA 41, C.A.D. 1115, 494 F.2d 703 (1974).

[C]ivil actions instituted by any person whose protest \* \* \* has been denied \* \* \*.

Though the complaints were filed in the name of the protestor, Verona Corporation, that corporation had at the time the complaints were filed been combined with others, through mesne combinations ultimately into Mobay, the presently named complainant. The government contends that:

[T]he attorneys for the defunct Verona Corporation purported to commence this action, as agents for that entity, after its dissolution. This is impermissible. The rule is well established that the death or dissolution of a principal, absent circumstances giving authority coupled with an interest, terminates the agency. [Citation omitted.]

There has been no showing that Mobay Chemical Corporation retained the law firm of one of its predecessors to commence and prosecute actions on its behalf.[27]

\*       \*       \*       \*       \*       \*

[27] The trial court may have considered an affidavit, filed *ex parte,* and apparently received in chambers on May 26, 1977. This affidavit, to which we had no opportunity to respond, fails to state that the disputed actions were filed by counsel as agent or attorney for the surviving corporation.

The affidavit referred to is by Donald W. Paley, attorney for Mobay, who stated therein that the law firm of which he is a member represented Verona Corporation, its successor Baychem Corporation, and the present Mobay Corporation. Paley further stated that "there has been a continuous understanding up to and subsequent to the merger \* \* \* that we were to continue to prosecute these actions on behalf of our client and that that understanding was unaltered by reason of the merger."

■   The practice of filing ex parte communications with the court cannot be condoned. Because the present communication has no effect on determination of the jurisdictional issue, its ex parte character may be disregarded without creating the appearance or implication of an endorsement of the practice. Fairness and integrity of the judicial process continue to require that opposing parties be informed of and normally provided opportunity to respond to communications with the court. That the government has not challenged the affidavit statements as false, misleading, or rebuttable, does not alter the impropriety of the affidavits having been filed ex parte.

■   The affidavit is irrelevant because the challenge that prompted it is irrelevant. The government does not challenge Mobay's accession to the rights of Verona, and does not allege absence of a continuity of interest on the part of the successive corporations in the subject protests. The government merely challenges the authenticity of counsel's authorization to prosecute the actions. Absent some evidence, other than the formal omission to file appropriate documents reflecting a continuity of corporate interest and counsel authorization, we will not presume that counsel has acted on a lark and without authorization.[5] That presumption would be particularly inappropriate where, as here, its indulgence would result in harm to a party. As this court has said, "statutes giving the right of appeal are to be liberally construed in furtherance of justice." *United States v. Wedemann & Godknecht, Inc.,* 62 CCPA 86, C.A.D. 1151, 515 F.2d 1145 (1975). Neither party relied on *Parksmith,* supra. The government does not appear to have been unduly burdened, or to have been disabled in preparation of its case in any manner, by counsel's failure to file with the complaint proof of authorization from the appropriate successor corporation or to file in the name of that corporation. Accordingly, we agree with the Customs Court that it had jurisdiction with respect to the three protests involved in the government's jurisdictional challenge.

5.   Nor will counsel be presumed to have committed champerty, professional misconduct under N.Y.Jud.Law § 90 (McKinney 1968).

375

*Conclusion*

The judgment of the Customs Court is *reversed* and the case is *remanded* for proceedings consistent with this opinion.

*REVERSED and REMANDED.*

BALDWIN, Judge, dissenting.

I would affirm the judgment below for the reasons given in the Customs Court opinion.