(C.D. 4748)

JANEX CORP. *v.* UNITED STATES

Court No. 77-5-00721

(Decided June 7, 1978)

*Sharretts, Paley, Carter & Blauvelt, P.C.* (*Peter Jay Baskin* of counsel) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*Laura D. Millman*, trial attorney), for the defendant.

NEWMAN, Judge: This action presents a classic instance for the appropriate utilization of a summary judgment—the procedural remedy which obviates protracted, expensive and unnecessary litigation where there is no justiciable question of fact.

The within case is before the court on cross-motions for summary judgment pursuant to rule 8.2. Presented for determination is the proper tariff classification for certain articles described on the invoices as "Raggedy Ann Nite Timers" and "Raggedy Andy Nite Timers", imported from Hong Kong through the port of New York in 1976.

The three entries involved herein were liquidated by the regional commissioner of customs as follows: In entry Nos. K520162 and K523068, the merchandise was assessed duty at the rate of 17.5 per centum ad valorem under the provision for "Dolls" in item 737.20, TSUS, as modified by T.D. 68–9; in entry No. K436738, the identical merchandise was assessed at the rate of 8.5 per centum ad valorem under the provision in item 772.15, TSUS, as modified by T.D. 68–9, for "household articles not specially provided for * * * of rubber or plastics: * * * Other".

Plaintiff challenges the Government's classifications, contending that the merchandise is properly dutiable at the rate of 5.5 per centum ad valorem under the provision in item 688.40, TSUS, as modified by T.D. 68–9, for "Electrical articles * * * not specially provided for".

## I.

To the extent relevant to these cross-motions, the record comprises the pleadings (including plaintiff's sales brochure depicting the imported articles, which is attached to the complaint and marked exhibit A), and the following:

Plaintiff submitted: an affidavit by its president, A. W. Hughes, Jr., and a sample of the Raggedy Andy Nite-timer containing two "D" size dry cell batteries.[1]

Defendant submitted: a sample of the Raggedy Andy Nite-timer (marked exhibit A), which is identical to plaintiff's sample, except that a plastic ring at the end of a pull-cord at the rear of the figure is missing; two "D" size dry cell batteries in a brown bag (marked exhibit B); and a copy of a letter (marked exhibit C) from plaintiff's counsel, stating that certain samples of the merchandise in issue submitted to defendant are identical to those covered by the entries in this action.

There is no dispute that the Raggedy Andy samples before the court are representative of the Raggedy Ann articles, for which no sample was furnished by either party.

Mr. Hughes' affidavit avers:

As president of Janex Corp., he was personally involved in the design and development of the "Nite-timers". These Nite-timers were designed, developed and sold by plaintiff as night-lights for small children, and "include features, which make them capable of being placed on a night table, dresser, or similar piece of children's furniture so that when lifted they would provide a source of illumination in the dark, or could provide such illumination by pulling the cord on

---

[1] These batteries were found on examination to be severely corroded, leaking and without power. Therefore, the samples of the merchandise in issue were operated by the court using the batteries submitted by defendant.

the back". Page 6 of plaintiff's 1976 catalog (exhibit A attached to the complaint) accurately depicts the Raggedy Ann and Raggedy Andy Nite-timers. Plaintiff's sample of the Raggedy Andy Nite-timers is identical to the imported Raggedy Andy Nite-timers, and is representative of the imported Raggedy Ann Nite-timers. The Raggedy Andy and Raggedy Ann Nite-timers differ "only to the extent that the doll housing is Raggedy Ann rather than Raggedy Andy". The imported articles were not sold, marketed or advertised as dolls, but as "Nite-timers".

Defendant interposed no supporting or opposing affidavit.

## II.

Fundamentally, of course, samples are potent witnesses and have great probative effect respecting the purpose for which an article is designed. *Amico, Inc.* v. *United States*, 79 Cust. Ct. 125, 130, C.D. 4723, 447 F. Supp. 444 (1977), *appeal pending; The Ashflash Corporation* v. *United States*, 76 Cust. Ct. 112, 120, C.D. 4643, 412 F. Supp. 585 (1976); *Amico, Inc. (Formerly Known As: Exhibit Sales, Inc.)* v. *United States*, 71 Cust. Ct. 182, 186, C.D. 4494 (1973). And this probative effect is particularly true here.

An examination of the samples submitted by the parties discloses that the imported articles consist of plastic figures, approximately 8-¼ inches in height, representing the form and features of the well-known storybook characters, Raggedy Andy and Raggedy Ann. The figures have a hollow interior which accommodates two "D" size dry cell batteries,[2] electrical switches, wiring, a bulb and other electrical components for illumination through the top of the figures. The articles are designed to light automatically when lifted off a surface (i.e., a dresser top), and switch off when set down again. This operation is accomplished by a pressure switch, which protrudes through the figure's feet when the article is lifted off a surface, and is depressed when the figure is set down again. Additionally, each figure has a pull-cord switch with a ring attached by which the light may be turned on for a brief period and then automatically turned off. Activation of the pressure or pull-cord switches, in addition to making the light turn on and off, also causes the figure's eyes to raise and lower simultaneously with turning the light on and off.

Defendant's exhibit A was operated in a darkened room and in artificial light, and was found to emit illumination typical of a nightlight. *Cf. The Ashflash Corporation* v. *United States, supra; Amico, Inc. (Formerly Known As: Exhibit Sales, Inc.)* v. *United States, supra.* Although defendant asserts (brief, p. 7) that its sample (exhibit A) illuminates for only three seconds, my examination revealed that when

---

[2] Batteries were not included in the importations.

the sample was lifted from a surface and held in the hand, it remained illuminated indefinitely, and when the pull-cord switch was utilized, it remained illuminated for approximately fifteen seconds.

Each Nite-timer is packaged for retail sale in a cardboard box, upon which is prominently printed:

RAGGEDY ANDY t.m. PORTABLE!
NITE-TIMER t.m. TAKE IT,
 CARRY IT,
THE AUTO-MAGIC ANYWHERE!
BOY & GIRL
NITE-TIME LIGHT

PICK ME UP . . . FOR AGES
LIGHT GOES ON . . . 4 & OVER
EYES OPEN WIDE!

PUT ME DOWN . . . . BATTERY OPERATED
LIGHT GOES OFF Requires 2 "D"
. . . . . EYES CLOSE! Cell batteries
 (not included)
SET TIMER . . . . . .
RAGGEDY ANDY KEEPS
HIS LIGHT ON UNTIL
YOU'RE SAFELY IN
BED . . . . AND HE
GOES TO SLEEP WITH
YOU!

*Significantly, nowhere on the package is the merchandise referred to as a "doll".*

## III.

Turning now to the legal aspects, plaintiff contends that the night-light feature makes the imported articles "more than" dolls and properly classifiable under item 688.40, TSUS, as electrical articles, not specially provided for. Further, plaintiff argues that the articles covered by entry No. K436738 are more specifically provided for under item 688.40, TSUS, than under item 772.15, TSUS.

Defendant's position is that the articles *in all three entries* are classifiable as dolls under item 737.20, TSUS; and that respecting entry No. K436738, plaintiff's claim under item 688.40 should be overruled *without affirming the classification under item 772.15*, TSUS.[3]

---

[3] In its answer, defendant interposed two alternative classifications: Item 737.20, TSUS (entry No. K436738 only), and item 653.39, TSUS, providing for illuminating articles of base metal. However, in its cross-motion, defendant does not urge the latter classification.

Additionally, defendant contends that if, as argued by plaintiff, the articles are "more than" dolls, then they are likewise more than electrical articles.

After careful consideration of the pleadings, the uncontradicted affidavit submitted by plaintiff (defendant submitted no supporting or opposing affidavit), the exhibits and the memoranda of law filed by the parties, I have no difficulty in concluding that there is no genuine issue as to any material fact, and that summary judgment should be rendered sustaining plaintiff's claim under item 688.40, TSUS.

## IV.

We first address the issue of whether the imported articles are dolls as classified by the Government (in two of the three entries), or "more than" dolls as claimed by plaintiff.

Plaintiff argues that "[e]ven if it is concluded that the nitetimers can function as dolls, one simply cannot ignore the fact that they are also night lights" (brief, p. 4). The thrust of defendant's position is that item 737.20, TSUS, is an *eo nomine* provision which covers all forms of dolls, and that "[t]he merchandise is a doll with an illuminating capacity hidden within it which may or may not be used but, when used, merely increases the play value of the doll" (brief, p. 21).

The law governing this case is succinctly enunciated in a recent decision, *Amico, Inc.* v. *United States, supra*, wherein one of the issues determined was whether the merchandise constituted a "music box" within the meaning of item 725.50, TSUS, or "more than" a music box by reason of the presence of a dancing couple. Respecting the "more than" doctrine, Judge Maletz commented (79 Cust. Ct. at 130–31):

> "It is well settled that merchandise which in fact constitutes more than a particular article or which has *additional nonsubordinate* or *co-equal* functions is not classifiable as that article." [Emphasis added.] Sturm, *A Manual of Customs Law* (1974), p. 298, and cases cited. Put otherwise, "[t]here has recently been a spate of cases in the Customs Court involving the 'more than' doctrine. It has been applied in cases where the article was found to have two coequal functions or *where a second function was not incidental, subsidiary or auxiliary.*" Sturm, *A Manual of Customs Law* (Supp. 1976), p. 72.
>
> *The question, therefore, is whether the dancing couple provides an incidental or subsidiary function,* as argued by plaintiff, or whether the dancing couple provides a nonsubordinate function, i.e., a function which is not incidental or subsidiary, as argued by defendant. For the reasons that follow, the court concludes that the function of the dancing couple is not incidental or subsidiary and that the imported articles are therefore "more than" music boxes. [Emphasis added in part].

In light of the foregoing, the nub of the issue here is whether the night-light function of the imported articles may be considered as an incidental, subsidiary, or auxiliary function of a "doll", as that term has been construed and applied by the court.

The question of what constitutes a "doll" has been before the court on many occasions. In *Russ Berrie & Co., Inc.* v. *United States*, 76 Cust. Ct. 218, C.D. 4659, 417 F. Supp. 1035 (1976), *appeal dismissed*, 63 CCPA 125 (1976), Judge Maletz reviewed a long line of decisions construing the tariff provision for dolls, and several lexicographical authorities, and made the following observations (76 Cust. Ct. at 223–25):

> It is well established in customs jurisprudence that the tariff provision for dolls is not a use provision but an *eo nomine* provision. *United States* v. *Cody Manufacturing Co., Inc., et al.*, 44 CCPA 67, 73–4, C.A.D. 639 (1957); *Louis Wolf & Co., Inc.* v. *United States*, 15 Cust. Ct. 156, 161, C.D. 963 (1945); *The American Import Company* v. *United States*, 22 Cust. Ct. 51, 53, C.D. 1158 (1949); *Barum Co., Inc.* v. *United States*, 30 Cust. Ct. 414, 417, Abs. 57251 (1953).
>
> Equally well established is the concept that a doll for tariff purposes is not confined to playthings for children but includes, a wide range of other articles including but not limited to dolls for ornamentation such as boudoir dolls, souvenir or prize dolls, dolls for display or advertising purposes, and dolls sold as gag items, bar gadgets, adult novelties, etc. *Louis Wolf & Co., Inc.* v. *United States, supra*, 15 Cust. Ct. at 157, 158; *Gold-Silver & Co.* v. *United States*, 35 Cust. Ct. 246, 247, Abs. 59301 (1955). \* \* \*
>
> \* \* \* \* \* \* \*
>
> As we have seen, the common meaning of the word "doll" encompasses a great variety of merchandise. Perhaps because the variety is so vast, the courts have not been able to render a comprehensive definition of the term "doll," nor have they been able to ". . . make any all-embracing finding as to what is a doll or to hold that all small figures are dolls . . . ." [Footnote omitted.] Nonetheless, there does appear to be a certain amount of agreement among the lexicographical authorities. To illustrate, we start with the following lexicographic authorities to which reference was made in *Louis Wolf & Co., Inc.* v. *United States supra*, 15 Cust, Ct. at 160:
>
>> . . . [W]e are of opinion that the common meaning of that term [doll] is sufficiently comprehensive to include all dolls, whether or not they are toys. In support of this view, it will be noted that the secondary definition of "doll" as given in Webster's New International Dictionary, 2d Edition, 1936, reads:
>>
>>> \* \* \* any similar figure for play or *ornament*. [Italics supplied.]

This broader view is further borne out by a comprehensive article on the subject of dolls appearing in the Encyclopaedia Britannica, 14th Edition, wherein the history, development and use of various types of dolls are set forth in detail, indicating besides their use as playthings for children, wide use in religious rites and other ceremonies in many parts of the world from earliest times to the present day.

More recent lexicographical authorities agree that the word "doll" encompasses a broad spectrum of articles which are commonly known as dolls. Thus in *Webster's New International Dictionary* (2d ed., 1953) p. 767, a doll is described as:

> doll * * * 2. A child's puppet; esp., a toy baby for a child; any similar figure for play or ornament.* * *

In Vol. 9 *Encyclopedia Americana* (Internat. ed., 1973) p. 255, a doll is described as:

> DOLL, a figurine of a human being. The word was first used for the child's toy about 1700, possibly as a contraction of Greek eidolon ("idol"), but more probably from the girl's name "Doll" which was short for "Dorothy." Some authorities now use the word only to refer to the child's toy. Other classes of dolls include religious figurines, objects of art and *souvenirs*. [Emphasis added.]

In Vol. 8 *Collier's Encyclopedia* (1973 ed.) p. 313, a doll is described as:

> DOLL, a plaything usually in the form of a baby or child, widely cherished by small girls; also, the ornamental figurines collected by adults as objects of art, curios, *keepsakes*, or *souvenirs*. [Emphasis added.]

Plainly, then, the figures representing Raggedy Ann or Andy, *standing alone*, respond to the common meaning of the term "doll". Nevertheless, the evident design, purpose and function of the articles as portable night-lights cannot be ignored. The major selling feature of the articles, clearly, is "THE AUTO-MAGIC NITE-TIME LIGHT". In my view, such feature is not incidental, subsidiary, or auxiliary to the use of the articles as "dolls", as that term is commonly used.

Significantly, too, the merchandise is not sold, marketed, or advertised as dolls (Hughes' affidavit, par. 10). Neither the descriptive representations contained in plaintiff's sales catalog (exhibit A attached to the complaint), nor those prominently printed on the retail packaging (portions of which have been quoted previously), refer to the merchandise, or any part thereof, as a doll.

Under these circumstances, defendant's contention that the articles are dolls with an incidental illuminating capacity to enhance their play value is totally without foundation. Although as pointed out in *Russ Berrie* the tariff provision for dolls has been broadly construed

to encompass a wide variety of articles, none of the definitions quoted or cases cited therein establish that the common meaning of the term "doll" is broad enough to encompass the instant night-lights h( used as Raggedy Ann and Andy figures.

*Cragstan Corporation* v. *United States*, 51 CCPA 27, C.A.D. 832 (1963), is somewhat analogous to the present case. There, a "Baby in Walker", consisting of a miniature of a clothed baby doll about 10 inches in height supported in an upright position by a metal walker, was held to be "[o]bviously * * * something more than just a figure or image of an animate object". As the rationale for its holding, the Court of Customs and Patent Appeals stated (51 CCPA 29–30):

> * * * The walker is not incidental—just a brace to hold the baby doll upright—the walker gives the toy its unique and distinctive character and without it the toy would be merely another baby doll. The toy, as an entity, consists of two components, both equally essential, the baby doll and the walking mechanism, the latter having wheels and part thereof being permanently attached to the baby doll. The walking mechanism is an integral part of the toy. * * *

> \* \* \* \* \* \* \*

> * * * The logical conclusion of appellant's argument is that a baby doll should be classified in the same category as a baby doll in a walker and since a baby doll in a walker is an entirely different toy than without the walker, we believe that it was not the intention of Congress that they both have the same classification.

Here, too, the merchandise consists of two components, both equally essential: the housing in the form of a doll, and the electrical or illuminating components which give the article its unique and distinctive character without which the article would be no more than another Raggedy Ann (or Andy) doll. Further, to paraphrase what our Appellate Court stated in *Cragstan*, since the present article with a function as a night-light is an entirely different article than a doll, which does not possess that function, I am clear that it was not the intention of Congress that they both have the same classification.

In sum, the articles in issue are not merely dolls, nor do the imported articles comprise dolls of which the illuminating feature is merely incidental. Rather, it is emphasized that the imported articles uniquely incorporate into one integral unit the separate functions of two articles (doll and night-light), thus constituting a new commercial article— a "Nite-timer"—with a distinctive and unique character of its own. Considering the "design, character, and purpose" of the imported articles as both a doll and as a night-light, their classification under item 737.20, TSUS, which covers solely the doll component, is plainly

precluded. *Cf. Clutsom Machines, Inc.* v. *United States*, 21 Cust. Ct. 30, 37. C.D. 1122 (1948).

Defendant urges that since the imported articles could be used in the daytime as dolls without utilizing their illuminating feature, the application of the "more than" doctrine is precluded.[4] This contention is also without merit. In *Sherriff-Guerringue, Inc.* v. *United States*, 62 Cust. Ct. 711, C.D. 3852 (1969), musical bubble-blowing saxophones, incorporating into one integral unit the separate functions of a toy saxophone and a child's bubble pipe, were held to be "more than" a toy musical instrument under item 737.60, TSUS, and properly classified as toys, not specially provided for under item 737.90, TSUS.

Respecting the use of the bubble-blowing mechanism, which plaintiff asserted was an incidental feature of the article, the court commented (62 Cust. Ct. at 713–15):

> \* \* \* the presence of the bubble-blowing apparatus clearly makes the article *more than* a toy musical instrument. For the record establishes (as we have seen) that the bubble-blowing mechanism is an integral and non-segregable part of the article, and that this mechanism and the musical part each constitutes an essential component of the finished article. In other words, the article before us incorporates into one integral unit the separate function of two separate toys—a toy saxophone and a child's bubble pipe, and thus constitutes a new commercial article with an unique and distinctive character of its own. "An article will be excluded from its normal provision when, by virtue of joinder with another article, it becomes an inseparable part of a multifunction entity. That is to say, when the change undergone is no longer merely an evolutionary advance or the addition of a subsidiary auxiliary part, the changed article becomes more than that which it formerly was." *V. Alexander & Company, Inc.* v. *United States*, 59 Cust. Ct. 510, 514, C.D. 3212, 276 F. Supp. 573, 576 (1967). See also *Garrard Sales Corp.* v. *United States*, 35 CCPA 39, C.A.D. 369 (1947) (combination phonograph and radio held not to be a phonograph); *A. Tanzi Engineering Co., Schneider Bros. & Co., Inc.* v. *United States*, 30 Cust. Ct. 4, C.D. 1490 (1952) (machine that both cuts and rolls pastry dough is more than either a cutter or roller); *Kaufman & Vinson Co.* v. *United States*, 44 Cust. Ct. 238, C.D. 2180 (1960) (combination map-measurer and magnetic compass is more than a measuring instrument).

> \* \* \* \* \* \* \*

Plaintiff, however, adverts to the testimony of its witness that in over 50 percent of the purchases that he has seen at fairs and dime stores, the children did not buy the bubble solution and were not observed using the bubble-blowing feature. From this plain-

---

[4] In paragraph 24 of its answer, defendant "avers that the imported articles consist of dolls *chiefly used in the household to illuminate a room at night*". [Emphasis added].

tiff concludes—as did the witness—that the bubble-blowing function is an incidental feature of the article. The argument has little merit. *For the question in a situation like that here is not how the article was actually used but what it was constructed and designed to do.* See e.g., *Dubrow & Hearne Manufacturing Co.* v. *United States,* 9 Ct. Cust. Appls. 148, 152, T.D. 37993 (1919); *United-Carr Fastener Corporation* v. *United States,* 56 Cust. Ct. 347, 351–52, C.D. 2648 (1966). [Emphasis added].

Here, too, the imported article notwithstanding its characteristics as a doll, was constructed and designed to be used as a night-light, and it is immaterial to what extent it was actually used. for that purpose.

The merchandise in the present case may be contrasted to that in *Astra Trading Corp.* v. *United States,* 56 Cust. Ct. 555, C.D. 2703 (1966), wherein Judge Ford, writing for the Second Division, held that a screwdriver with a flashlight component for illumination was not more than a screwdriver due to the presence of the illuminating feature. Respecting the "more than" issue, the court stated (56 Cust. Ct. at p. 561):

> The decision in *United States* v. *A. W. Fenton Company, Inc.,* 49 CCPA 45, C.A.D. 794, cited by plaintiff, is distinguishable. In that case, the imported article contained a motor which also embodied gears and a frame which served as a housing for other parts of the floor polisher. The additional features made the article more than a special type of a motor since it formed part of the assembly of the floor polisher. *The rationale of the A. W. Fenton decision, supra, would be applicable herein if the record showed that the article had a use in addition to its use as a screwdriver.* However, plaintiff's own witness, when questioned as to the purpose of the importation, stated, without qualification, that the article was "designed specifically to be used as an illuminated screwdriver," and "the purpose of this entire item is to be used as a screwdriver * * *."
>
> * * * We do not believe that the additional feature of illumination transforms the basic purpose of the imported article from use as a screwdriver into some other use; *nor do we believe that the illuminating feature gives the article a use in addition to its intended use as a screwdriver.* For, illumination notwithstanding, the article remains essentially a device restricted to the use of turning screws, i.e., a screwdriver. * * * [Emphasis added].

Significantly, the illuminating feature of the screwdriver in *Astra* merely assisted or facilitated the screw-turning function, whereas in the present merchandise the illuminating feature performs a function as a night-light, which is independent of any function or use the articles may have as a doll. And unlike such features commonly incorporated in dolls as mechanisms that create tears, cause the arms or legs to move, produce a voicelike sound, or otherwise contribute

to a lifelike simulation,[5] the illuminating feature of the instant articles does not in the least contribute to a lifelike simulation. On the contrary, the illumination feature was solely intended to make the articles useful *in the dark* as a night-light, a function mutually exclusive of the articles' use as dolls.

Similarly, the imported articles are not at all analogous to the figurines in *United States* v. *Cody Manufacturing Co., Inc., et al.*, 44 CCPA 67, C.A.D. 639 (1957), which were dedicated to exclusive use as dancing dolls for a music box.

## V.

Having determined that the imported articles are more than dolls, we now turn to plaintiff's claim that the merchandise is properly dutiable as "Electrical articles * * * not specially provided for" under item 688.40, TSUS. Fundamentally, of course, even though a plaintiff has established that the Government's classification is erroneous, the plaintiff has the burden of proving the correctness of its own claimed classification. *Amico, Inc.* v. *United States, supra.*

Central to the dispute respecting plaintiff's claim is whether the description "electrical articles" in item 688.40, TSUS, fully describes the imported articles. Defendant advances the argument that item 688.40 "does not describe the entire article, but only an interior element" (brief, p. 25). Such argument is untenable.

Obviously, the description "electrical articles" is broad enough to encompass not merely an interior electrical element, but also any exterior housing or casing enclosing such element. Here, the Raggedy Ann and Andy figures serve as the exterior housing for the night-lights, and consequently the imports are not more than "electrical articles", as urged by defendant.

## VI.

Defendant also insists that the imported articles cannot be used as night-lights because, by definition, night-lights provide illumination of long duration, and are intended to be stationary. However, defendant has overlooked that the Tariff Commission (now International Trade Commission) recognizes there are portable "night-lights" with a self-contained electric source, which are "designed to light automatically when lifted off a surface and switch off when set down again". See *Summaries of Trade and Tariff Information*, Sched-

---

[5] In *Brechner Bros.* v. *United States*, 58 Cust. Ct. 272, 275, C.D. 2959 (1967), the court observed: "Certainly the court can take judicial notice of the fact that technological advances have visited the dollmaking business to the extent that walking, talking; and crying dolls of all sizes and shapes permeate the modern market places. The extent and degree of imaginative and *lifelike features* incorporated in these products are sometimes almost incredible." (Emphasis added).

ule 6, Vol. 10 (1969), p. 216.[6] The "Nite-timers", of course, meet that description.

## VII.

Finally, as pointed out by Judge Rich, writing for the Court of Customs and Patent Appeals in *The Englishtown Corp.* v. *United States*, 64 CCPA 84, C.A.D. 1187, 553 F.2d 1258 (1977), in applying the "more than" doctrine, only the most general rules can be ascertained from the previous decisions, and each case must in the final analysis be determined on its own facts. See also *United States* v. *Mobay Chemical Corporation*, 65 CCPA —, C.A.D. 1206, 576 F. 2d 368 (1978). Predicated upon the undisputed facts in this case, I find that the imported articles possess a "second significant function" justifying the application of the "more than" doctrine. *Cf. United States* v. *Oxford International Corp.*, 62 CCPA 102, 105, C.A.D. 1154, 517 F. 2d 1374 (1975). Therefore, the imported articles are more than dolls, as provided for in item 737.20, TSUS, and are classifiable as electrical articles, not specially provided for under item 688.40, TSUS. The provision in item 688.40, TSUS, is more specific than item 772.15, TSUS, the provision under which the merchandise was classified by the Government in entry No. K436738. *Prestigeline (Div. of Weiman Co., Inc.)* v. *United States*, 75 Cust. Ct. 139, C.D. 4618, 406 F. Supp. 532 (1975). Hence, plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied. Judgment will be entered accordingly.

(C.D. 4749)

---

[6] According to the *Summaries, supra*, item 683.80, TSUS, covering portable electric lamps with self-contained electric source (other than flashlights) specifically encompasses *portable night-lights*. But, item 683.80, TSUS, is not asserted by either plaintiff or defendant. Plaintiff's position is that although the merchandise is more than a doll, it is similarly more than a portable night-light, and "[t]he one tariff provision which fully describes the subject articles, notwithstanding their dual function character, is Item 688.40, TSUS, as claimed by the plaintiff". (Brief, p. 9).