Dated: Miami, Florida; August 7, 1981.

HOUSE OF IDEAS, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 78-7-01323

Before WATSON, *Judge.*

(Decided August 11, 1981)

*Glad & White* (*Edward N. Glad* at the trial; *Steven B. Lehat* on the brief) for the plaintiff.

*Stuart E. Schiffer,* Acting Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Saul Davis* at the trial and on the brief) for the defendant.

WATSON, *Judge:* Plaintiff challenges the denial of its protest against the government's classification of his merchandise as dolls, under Item 737.20, TSUS,[1] as modified by T.D. 68/9, dutiable at 17.5 percent ad valorem. Plaintiff contends that the proper classification of the merchandise is "articles of papier-mache not specially provided for," under Item 256.75,[2] TSUS, which is duty free under the General System of Preferences, for products of Taiwan.

[1] Item 737.20. Dolls, and parts of dolls including doll clothing
17.5% ad val., 70% ad val.
Dolls (dressed or undressed).
[2] Item 256.70. Articles, of pulp, of papier-mache, of paper, of paperboard, or of any combination thereof, not specially provided for:
Of pulp. not including articles of paper or of paperboard 5% ad val. .30% ad val.
Of papier-mache, 4% ad val., 25% ad val.

The items in question were exported from Taiwan on March 25, 1977 and entered at the Port of Los Angeles. They are described on the Special Customs Invoice and the GSP Certificate of Origin as "Toys #452 Clown Bank." Plaintiff's Exhibit 1, which is a representative sample of the items, is a brightly colored, hollow, papier-mache figure in the form of a clown with a top-hat. The figure is 7 and ¾ inches tall and (approximately) 11 inches in circumference at the waist. In the back of the figure's head there is a slot for coins, and in what would be the bottom (The bottom of the sample was destroyed to determine its component materials.) there is a hole with a rubber plug.

I

Plaintiff argues that this object is a bank and the clown-like attributes of the sample are ornamental, and without independent commercial significance. Alternatively, plaintiff argues that if there is a doll component to the object, the integration of the functions and features of the doll and the bank makes the object "more than" a doll.

The government's defense is that the plaintiff has failed to adduce any proof which shows the sample to be more than a doll. Additionally, it argues that the doll provision is an "eo nomine" provision and, based on lexicographical authorities and plaintiff's own advertising materials, it is sufficiently broad a term to encompass this article.

For reasons set forth below it is the opinion of the Court that the items in question are not fully described as dolls.

In *Janex Corp.* v. *United States*, 80 Cust. Ct. 146, C.D. 4748 (1978), the Court was confronted with plastic figurines resembling the fictional characters Raggedy Ann and Raggedy Andy, which were designed to light up when lifted up off a surface and switch off when placed down. The Court, in granting summary judgment to the plaintiff, held that the nightlight feature was "not incidental, subsidiary, or auxiliary to the use of the articles as 'dolls' as that term is commonly used." Id. at 152. The rationale was that the plastic figurine combined the separate functions of two distinct articles, i.e., a doll and a nightlight, resulting in a hybrid product with unique commercial and design properties and a purpose distinct from that of a doll. Therefore, Item 737.20, TSUS, providing only for the doll aspect of the plastic figure, inadequately described the article, and classification as such was incorrect.

Defendant argues that the items in question do not meet the "two equally essential functions" test of *Janex*. The design and construction of plaintiff's exhibit #1 belie that contention. It is patently clear that the object has two design characteristics. One, the doll

component, has the superficial appearance of a human figure. The other, the bank component, has the function of a receptacle and storage space for coins or folded bills. Inasmuch as the commercial viability of the item depends on its functioning as a bank, this aspect of the article is not insignificant or incidental to the use of the article as a replica of a human figure. The Court is of the opinion, that the item satisfied the rationale of *Janex, supra.*

Defendant's reliance on *Fortune Star Products Corp.* v. *United States,* 78 Cust. Ct. 184, C.R.D. 77–3 (1977), to uphold the classification of the items as dolls is misplaced. There, Judge Maletz denied plaintiff's motion for summary judgment in which plaintiff argued that a doll figure containing a radio, was "more than" a doll based on the "predominant cost" of the radio. The motion was denied because plaintiff's affidavit regarding the costs, lacked "documentation, detail and explanation" and was inadmissible on evidentiary grounds.

In any event, the "predominant cost" analysis is not apropos to the specific facts of this case. The item in question does not have two or more physically severable, separately identifiable parts, the costs of which can be examined in isolation, and weighed against each other, as was the case in *Fortune,* supra. Rather the existence of the doll and bank components of the article springs from a unitary and indivisible source—the shaped papier-mache.

Likewise, *Amico, Inc.* v. *United States,* 66 CCPA 5, C.A.D. 1214, 586 F. 2d 217 (1978) and *United States* v. *Cody Manufacturing Co., Inc., et al.,* do not support the classification of this merchandise as a "doll." In *Amico,* the Court of Customs and Patent Appeals ruled that a music box with two dancing figures was incorrectly held to be "more than" a music box. The Court concluded that the fact that the two dancers "constituted a major selling feature" was insufficient to justify the invocation of the "more than" doctrine. It reasoned that the function of the two figures was "solely that of design and appearance," and that they had no value, or commercial function apart from their connection with the music box. Here the human shape has no function other than to make attractive the receptacle and storage space which is the bank component of the article, so as to make it desirable to the intended class of users. If anything, the *Amico* rule that commercial function rather than design and appearance is the determinant of classification suggests that the doll portion of this article should not be the basis for classification.

In *Cody,* the Court held that a plastic figurine with a spike extending from its torso, was not "more than" a doll. The spike served no purpose other than to connect the figurine to a music box so it could appear to dance while the music box was in operation. The Court's analysis hinged on the fact that the metal spike in no way altered the

appearance or use of the figurine as a replica of a ballerina. That is to be distinguished from the case at hand, where the item is a replica of a human being, yet has an important unrelated function as a bank.

The government's alternative argument is that the dolls provision of the TSUS is an "eo nomine" provision, and as such the Court is prevented from looking to the use of the article in question and must instead look to lexicographical authorities and plaintiff's own descriptions of similar articles, to determine whether it is a doll.

The simple answer to this argument is that there is no all encompassing definition of what is a doll. *Russ Berrie & Co., Inc.* v. *United States*, 76 Cust. Ct. 218, 224–5, C.D. 4659, 417 F. Supp. 1035 (1976). While the Court is to be *guided* by lexicographical authorities, there need not be a slavish or automatic deference to what lexicographical authorities define as dolls. This is especially so when the lexicographical authorities describe as dolls items (Def. Br. at 28) which by law may not be dolls. The Mr. Peanut salt and pepper shakers described as "doll" in defendant's exhibit #B–1, and "kewpies" designed to hold talcum powder in defendant's exhibit #B–2 are cases in point. It is true that plaintiff in its merchandising materials has described banks in human form, painted to resemble the native costumes of different countries as the "Bank Dolls of all Nations." (Defendant's Exhibit #B–5.) This fact is not dispositive of the issue of whether the item before the Court is a doll. The manner in which an article is merchandised is but one of several factors to be considered in determining the proper classification of an article. *S.Y. Rhee Importers* v. *United States*, 61 CCPA 2, 4 C.A.D. 1108, 486 F. 2d 1385 (1973); *Ignaz Strauss & Co., Inc.* v. *United States*, 37 CCPA 32, 35 C.A.D. 415 (1949); *Russ Berrie & Co., Inc.* v. *United States*, 76 Cust. Ct. 218, 226 C.D. 4659, 417 F. Supp. 1035 (1976); *Novelty Import Co., Inc.* v. *United States*, 53 Cust. Ct. 274, 276, Abs. 68780 (1964).

Moreover, it should be made clear, that the Court may consider the use of a product to determine its identity, even if it is alleged that the product falls within an "eo nomine" tariff provision. *United States* v. *Quon Quon Company*, 46 CCPA 71, 74 (1959).

To sum up, the Court is of the opinion that the merchandise is not adequately described by Item 737.20 of the TSUS as modified by T.D. 68/9 for dolls, but rather is more properly classified as "articles of papier-mache not specially provided for" under Item 256.75 of the TSUS.

## II

In response to the plaintiff's request for GSP treatment the government argues that form "A" entitled "Generalized System of Preferences, Certificate of Origin" filed with the entry is sufficient only to

serve as proof of "compliance with regulations." That is to say, the government claims form "A" is insufficient to show compliance with the statutory requirements of General Headnote 3(a)(ii) of the TSUS. The government further argues that completion of the form by the exporter rather than the manufacturer, vitiates the use of form "A" as evidence of the origin of the merchandise in question.

Both of these contentions are without merit. Section 3(a)(ii) of the General Headnotes and Rules of Interpretation for the TSUS (1976), plainly confers power on the Secretary of the Treasury to promulgate regulations for the implementation of the Tariff Schedules.[3]

This being a lawful delegation of power, compliance with the regulations issued by the Secretary of the Treasury is a precondition to receiving GSP treatment. *Socony Vacuum Oil Co., Inc.* v. *United States*, 44 CCPA 83, 90, C.A.D. 641 (1957); *J. E. Bernard & Co.* v. *United States*, 62 Cust. Ct. 304, 310, C.D. 2750, 304 F. Supp. 1034 (1969).

19 CFR 10.173 (1980) entitled "Evidence of the Country of Origin," regarding the Generalized System of Preferences Certificate of Origin form "A," states in plain English that the form shall be filed with the district director, "as evidence of the country of origin." [4] Inasmuch as the language of 19 CFR 10.176 (1980) [5] duplicates the language of General Headnote 3(a)(ii), requiring that not less than 35 percent of the value of the article inclusive of materials and production costs be attributable to the beneficiary country, it is reasonable to conclude that compliance with the regulations is compliance with the General Headnote.

Plaintiff offered uncontroverted proof that form "A" was completed in the manner required by regulation, and that its contents were not challenged by Customs officials. In addition, it was proved that the

---

[3] Whenever an eligible article is imported into the customs territory of the United States directly from a country or territory listed in subdivision (c)(i) of this headnote, it shall receive duty-free treatment, unless excluded from such treatment by subdivision (c)(iii) of this headnote, provided that, in accordance with regulations promulgated by the Secretary of the Treasury:

    (A) the sum of (1) the cost or value of the materials produced in the beneficiary developing country plus (2) the direct costs of processing operations performed in such country is not less than 35 percent of the appraised value of such article at the time of its entry into the customs territory of the United States; or

  \*      \*      \*      \*      \*      \*      \*

[4] § 10.173 Evidence of the country of origin:

    (a) *Shipments valued in excess of $250.*—(1) *Certificate of Origin.* Except as provided in paragraph (a)(5) of this section, the importer or consignee of a shipment of eligible merchandise valued in excess of $250 shall file with the entry the Generalized System of Preferences Certificate of Origin Form A, *as evidence of the country of origin.* Form A *shall be signed by the exporter of the merchandise* in the country from which it is directly imported, certified by the designated governmental authority in that country, and properly completed. [emphasis supplied]

[5] § 10.176 Country of origin criteria.

    (a) *Merchandise produced in one beneficiary developing country.* Merchandise which is the growth, product, manufacture, or assembly of a beneficiary developing country and which is imported directly from such beneficiary developing country may qualify for duty-free entry under the Generalized System of Preferences only if the sum of the cost or value of the materials produced in the beneficiary developing country, plus the direct costs of processing operations performed in such country, is not less than 35 percent of the value of the article as appraised in accordance with section 402 or 402a, Tariff Act of 1930, as amended (19 U.S.C. 1401a, 1402).

form contained the designation "P" in column 8 indicating the materials and manufacture of the merchandise in question were completely indigenous to Taiwan. Thus the burden of proof as to why the merchandise should not receive GSP treatment was placed squarely on the government.

The government has not satisfied this burden of proof with the argument that form "A" is not to be given credence because it was completed by the exporter rather than the manufacturer. The government claims the exporter has no actual knowledge of the origin of the materials, or of the production costs involved in manufacturing the goods in question. This argument may have merit, but it contravenes the plain language of 19 CFR 10.173(a)(1) (1980), requiring the *exporter* to sign form "A." In addition, this argument ignores two facts. The first being that form "A" is *certified by an independent governmental authority of the exporting country,* designated for that purpose by the Customs Service. R. Sturm, *Customs Law and Administration,* § 63.6 (1980). The second being that customs officials can request further evidence of the country of origin as such evidence is "subject to such verification as the district director deems necessary.'' 19 CFR 10.173(a)(4) (1980).[6] There is no indication in the record that such information was requested.

In light of the above, this Court is of the opinion that the information in Form "A" completed by Dependable Products (the exporter) in conformance with the requirements of 19 CFR 10.173 (1980) is evidence of the country of origin of the merchandise in question.

As the merchandise in question is the product of Taiwan,[7] and is properly classifiable under Item 256.75 of the TSUS, it is entitled to GSP treatment.

The Court having determined that the merchandise is entitled to GSP treatment, which under the TSUS means it is duty-free, need not reach the issue of valuation.

For the reasons expressed above, it is held that the merchandise in question is properly classifiable as articles of papier-mache not specially provided for under Item 256.75 of the TSUS. Accordingly, the merchandise is duty-free, as Item 256.75 is entitled to GSP treatment and Taiwan was a beneficiary country for purposes of the GSP in 1976.

Judgment will enter accordingly.

---

[6] (4) *Verification of evidence.* Evidence of the country of origin required under this paragraph shall be subject to such verification as the district director deems necessary.

[7] Taiwan is listed as the "Republic of China" on the list of countries designated as "Beneficiary Developing Countries for Purposes of the Generalized System of Preferences" General Headnote 3(c)(1), TSUS, 1976.